**C/R TV CABLE, INC., Plaintiff,**

v.

**SHANNONDALE, INC., Michael M. Johnson, Mid–Atlantic Cable Limited Partnership of Jefferson County, and Mid–Atlantic Cable Service Company, Defendants.**

**Civ. A. No. 92–0017–M.**

United States District Court,
N.D. West Virginia,
Martinsburg Division.

May 21, 1992.

---

Lucien G. Lewin, Curtis G. Power, III, Martinsburg, W.V., Paul Glist, John D. Seiver and Robert G. Scott, Jr., Washington, D.C., for plaintiff.

Wm. Douglas Taylor, Martinsburg, W.Va., Mark J. Tauber, Nora G. Garrote and Mary E. Gately, Washington, D.C., for defendants.

## MEMORANDUM OPINION

MAXWELL, Chief Judge.

Plaintiff C/R TV Cable, Inc. ("C/R") filed a Verified Complaint for Injunctive and Declaratory Relief (the "Verified Complaint") and Motion for Preliminary Injunction (the "Motion") on March 20, 1992 against Defendants Shannondale, Inc. ("Shannondale"), Michael M. Johnson, Mid–Atlantic Cable Limited Partnership of Jefferson County and Mid–Atlantic Cable Services Company ("Mid–Atlantic").

In Count I of the Verified Complaint, Plaintiff asserts a right of access under the Cable Communications Policy Act of 1984 (the "Cable Act"), 47 U.S.C. § 541(a)(2), to certain public rights-of-way, private roads and existing utility easements located in the Shannondale subdivision, Jefferson County, West Virginia ("the Subdivision"). Plaintiff asserts a similar right of access in Count II of the Verified Complaint under the West Virginia Cable Television Systems Act (the "West Virginia Act"), West Virginia Code §§ 5–18–1 *et seq.* In Count III of the Verified Complaint the Plaintiff seeks a ruling declaring void an agreement under which Mid–Atlantic is to be provided an "exclusive" right to use easements and rights-of-way in the Subdivision. In Count IV of the Verified Complaint, Plaintiff seeks a declaratory ruling from this Court that the Cable Act and West Virginia Act, as well as a license agreement entered into by Shannondale and Potomac Edison Co. ("Potomac Edison"), grant Plaintiff a right to construct its cable system over public rights-of-way and existing utility easements in the Subdivision.

In its Motion, Plaintiff seeks an injunction that would both restrain the Defendants from interfering with its alleged statutory and contractual rights of access to public rights-of-way and existing utility easements at the Subdivision and require the Defendants to allow C/R immediate and continued access.

In response, Defendants argue that the Plaintiff does not possess the statutory or contractual rights it asserts and that granting Plaintiff's requested relief would constitute a taking without just compensation, in violation of the Fifth Amendment to the United States Constitution. Defendants also argue that Plaintiff has failed to make the showing of irreparable injury that is required for the extraordinary relief of a preliminary injunction.

For the reasons stated below, the Court finds that Plaintiff has not made the showing necessary to sustain its Motion, which will, therefore, be DENIED.

## I. FINDINGS OF FACT

The Court makes the following findings of fact after a review of the record created by the pleadings, the declarations and affidavits of witnesses, the oral testimony of witnesses, and the exhibits submitted into evidence at the April 28, 1992 hearing on Plaintiff's Motion:

1. The Subdivision at issue is a residential development that consists of 4000 acres. There are over 5000 lots

at the Subdivision that have been surveyed and divided. Defendant Shannondale is the developer of the Subdivision and the original owner of all the lots.

2. All of the lots at the Subdivision with the exception of approximately 120, have been sold by Shannondale to individual lot owners.

3. There are 909 houses at the Subdivision and 653 of the houses are occupied by full-time residents.

4. The Citizens of Shannondale, Inc., a voluntary residents' association at the Subdivision, has 372 members.

5. The deeds from Shannondale to Michael M. and Frances M. Johnson ("Johnson Deed") dated March 16, 1989, and from Shannondale to Albert M. and Ruth D. Fitzgerald ("Fitzgerald Deed") dated December 21, 1974, contained in Plaintiff's Exhibit 5, are representative of the deeds entered into by Shannondale and the other individual lot owners at the Subdivision. The Johnson Deed contains the following relevant restrictive covenants and reservations:

10. Since no commercial enterprises will be permitted which could destroy the desirability and beauty of this natural woodland, seller reserves all oil, water and mineral rights. However this does not prohibit the development of a water well for private use. No lake water may be pumped, or drawn off, for private use, except by written permission of Shannondale, Inc.

11. Road maintenance fees shall be paid (June 1) annually to Shannondale, Inc., or its assigned agent, on this lot. The fee shall be $30.00 per year, per lot and the assessment shall be reevaluated each five years based on the Federal Government Cost of Living Index. Failure to pay road fees within 60 days of the due date shall automatically create a lien on the property.

12. Seller reserves a right of way with right of entry upon, over, across and through said lot for purposes of constructing, operating, maintaining and repairing, pole lines for electrical and telephone services, and other utilities, reserving to the Seller the sole right to convey the rights hereby reserved.

Johnson Deed at Paragraphs 10–12:

6. The Fitzgerald Deed contains covenants almost identical to those numbered 10 and 12 in the Johnson Deed, with a somewhat different provision for roads. Paragraph 16 of the Fitzgerald Deed provides:

16. All roads and driveways within the property hereby conveyed are to remain private, to be used by lot owners and their invitees only. Road maintenance costs shall be prorated between property owners serviced, fronting on, or benefited by such roads, not to exceed $10.00 per lot per year.

The three remaining deeds in Exhibit 5, respectively dated November 15, 1972, March 13, 1965, and January 16, 1956, all contain a Paragraph 16 substantially identical to Paragraph 16 of the Fitzgerald Deed. The reservations and restrictions of the Johnson Deed and the Fitzgerald Deed are typical of those in all deeds from Shannondale to lot owners.

7. There are approximately five miles of public road within the Subdivision that Shannondale conveyed to the West Virginia Department of Highways pursuant to a deed dated March 25, 1980, contained in Plaintiff's Exhibit 12.

8. There are approximately 55 miles of private roads in the Subdivision that are owned by Shannondale.

9. Shannondale granted Potomac Edison and its predecessors easements for the purpose of the construction of electric and telephone facilities at various sections of the Subdivision ("the Potomac Edison easement agreements"). Plaintiff's Exhibits 8, 9, and 10 are copies of three deeds dated August 22, 1955 and August 30, 1955, through which Shannondale granted easements to Potomac Edison. Specifically, Shannondale granted these easements to Potomac

Edison "for the purpose of the installation, erection, maintenance, repair and operation of electric transmission and distribution pole lines, and electric service lines, with telephone wires thereon." All three deeds contain this identical language, and all three specify that the easements include a right of way "five (5) feet in width, over, along and upon the rear and dividing lines of and between any lots" in existence or subsequently laid out.

10. Shannondale, by a deed dated August 7, 1991, also granted Potomac Edison a similar easement for another section of the Subdivision. Plaintiff's Exhibit 11 is a copy of this deed, which states that the easement is granted "for the purpose of constructing, reconstructing, inspecting, operating and maintaining an overhead and/or underground electric and communication system including all necessary poles, anchors, wires, trenches, conduits, cables and other facilities ... and to permit the installation of wires, cable, conduit or other facilities of any Company or persons."

11. Mr. Johnson testified at the hearing that he believed that the vast majority of the Potomac Edison poles within the Subdivision were not located on property owned by the individual lot owners but lie within the thirty-foot road rights-of-way.

12. Both C/R and Mid–Atlantic have received a franchise from the County Commission of Jefferson County to provide cable television service within the County. Plaintiff's Exhibit 1(A) and 4 are copies of the C/R and Mid–Atlantic franchises, respectively.

13. C/R has a license agreement with Potomac Edison for the use of Potomac Edison's poles to string cable television wires.

14. C/R's license agreement is found at Plaintiff's Exhibit 1(B) and, in relevant part, states:

4. The payment of rent by Licensee [C/R] shall not give Licensee [C/R] a right to use said facilities of Potomac for any particular term, it being distinctly understood and agreed that either party may terminate this License Agreement at any time after the expiration of the first year thereof, by giving the other party thirty days notice in writing of its desire to terminate it.

5. Upon notice at any time from Potomac to Licensee [C/R] that the use of said facilities is forbidden by ... property owners having a legal right to object to such use, ... this license shall immediately terminate....

12. Nothing herein contained shall be construed to confer upon Licensee [C/R] any rights of property in the plant facilities of Potomac or as a guarantee to Licensee [C/R] of permission from Municipal or other public authorities or property owners to use the plant facilities of Potomac.

15. At oral argument, counsel for Mid–Atlantic represented that Mid–Atlantic has a similar license agreement with Potomac Edison.

16. There is no cable television system presently operating at the Subdivision.

17. In November, 1991, Plaintiff began construction of its cable television system pursuant to its license agreement with Potomac Edison and its Franchise Agreement. Construction was terminated on January 8, 1992, at the request of Shannondale.

18. The testimony reflects that Shannondale and Mid–Atlantic have entered into a written contract for the provision of cable television service at the Subdivision, under which Mid–Atlantic agreed to pay Shannondale five percent of the receipts of Mid–Atlantic.

## II. CONCLUSIONS OF LAW

1. This Court must consider the following four factors in determining

whether preliminary injunctive relief is appropriate:

(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;

(2) the likelihood of harm to the defendant if the requested relief is granted;

(3) the likelihood that the plaintiff will succeed on the merits; and

(4) the public interest.

*See Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977); *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991); *L.J. By and Through Darr v. Massinga,* 838 F.2d 118, 120 (4th Cir.1988), *cert. denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989). "[T]he '[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction.'" *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802 (4th Cir.1991) (citations omitted).

2. Under *Blackwelder,* the harm to the plaintiff and defendant are the two most important factors. *Rum Creek,* 926 F.2d at 359. The test established by *Blackwelder* and its progeny require a sequential analysis.

If it should be found that the plaintiff has made a "clear showing" of irreparable injury absent preliminary injunctive relief, the next step then for the court to take is "to balance the 'likelihood' of irreparable harm to the plaintiff [from failure to grant interim relief] against the 'likelihood' of harm to the defendant [from the grant of such relief]...." *Blackwelder,* 550 F.2d at 195.

*Direx Israel,* 952 F.2d at 812.

3. If, after balancing the harm to the plaintiff and to the defendant, "the balance 'tips decidedly' in favor of the plaintiff ..., a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation'."

*Rum Creek,* 926 F.2d at 359, *citing Blackwelder,* 550 F.2d at 195; *Todd by Todd v. Sorrell,* 841 F.2d 87, 88 n. 2 (4th Cir.1988).

4. As the balance tips away from the plaintiff, a stronger showing on the merits is required. *Rum Creek,* 926 F.2d at 359, *citing Telvest, Inc. v. Bradshaw,* 618 F.2d 1029 (4th Cir. 1980).

5. The record before the Court fails to clearly establish that Plaintiff will suffer actual, immediate, irreparable injury in the absence of an injunction.

6. Because the record before the Court does not show the present threat of irreparable harm to the Plaintiff, the Plaintiff's Motion for Preliminary Injunction will be DENIED. An appropriate Order shall be entered.